# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5172 | **DATE** | 9/25/2003 |
| **CASE TITLE** | Gary L. Gillespie vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ **[Other docket entry]** **Enter memorandum opinion and order on plaintiff's and defendant's motions for summary judgment. Plaintiff's motion for summary judgment is granted in so far as it requests a remand of the ALJ's decision. The defendant's motion for summary judgment is denied. The cause is hereby remanded to the Commissioner of Social Security for further proceedings consistent with this opinion per sentence 4 of 42 U.S.C. 405. Judgment is entered pursuant to Rule 58 F. R. C. P.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 9 2003 | 21 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | 9/26/2003 | |
| | Copy to judge/magistrate judge. | CLERK | date mailed notice | |
| SM | courtroom deputy's initials | 03 SEP 26 AM 11:01 | SM mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GARY L. GILLESPIE,       )
                         )
    Plaintiff,         )
                         )
v.                       )    Case No. 02 C 5172
                         )
JO ANNE B. BARNHART,    )    Magistrate Judge Ian H. Levin
Commissioner of the Social Security )
Administration,          )
                         )
    Defendant.       )

DOCKETED
SEP 2 9 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Gary L. Gillespie ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA") denying his applications for Disability Insurance Benefits ("DIB") and Social Security Insurance ("SSI") under the Social Security Act (the "Act"). Before the Court are the parties cross-motions for summary judgment in the cause. For the reasons set forth below, the Court remands the cause for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On January 26, 2000, Plaintiff applied for DIB[1] and SSI alleging that, as of May 16, 1999, he became disabled due to a back impairment and depression.[2] (R. 56-60, 75-84, 297-98.) Plaintiff's applications for benefits were initially denied on March 7, 2000. (R. 28-31, 300-03.) Subsequently,

---

[1] Plaintiff has a date last insured for DIB of June 30, 2001. (R. 21, 68, 85.)

[2] References are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

21

on July 31, 2000, Plaintiff's requests for reconsideration were also denied. (R. 32-37, 305-07.) Plaintiff then filed a timely request for an administrative hearing and, on November 19, 2001, Plaintiff appeared with a paralegal and testified at a hearing before an Administrative Law Judge ("ALJ"). (R. 38-40, 308-326.) A Vocational Expert ("VE") also testified at the hearing. (R. 326-30.)

On January 22, 2002, the ALJ issued his decision finding that Plaintiff was not disabled. (R. 11-22.) Plaintiff then filed a request for review of the ALJ's decision, and, on May 24, 2002, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 5-7.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

### I. PLAINTIFF'S BACKGROUND/TESTIMONY

Plaintiff was born on June 25, 1953, and was forty-eight years old at the time of the administrative hearing. (R. 20.) Plaintiff received a high school graduate equivalency diploma (GED), had specialized training in masonry and attended college for one year. (R. 82.) Plaintiff has worked *inter alia* as a hand packager, bartender, automobile detailer, service station attendant, and taxi car driver. (R. 61-66, 77, 111.)

At the administrative hearing, Plaintiff testified that he last worked in September of 1999.[3]

_____

[3]On September 25, 1999, Plaintiff stopped working because his back pain was so severe that he could no longer perform his duties. (R. 76.) To substantiate his disability applications, Plaintiff's day supervisor and manager reported to an SSA reviewer that he had been placed on light duty starting in July of 1999 (after he returned to work) and that he "couldn't really do much after that." (R. 92.) Plaintiff missed the last couple of weeks in May, the entire month of June, and "a day here and there" through September 25, 1999. (R. 92.) Therefore, based on
(continued...)

2

(R. 312.) Plaintiff stated that he stopped working because his back pain became so severe that he was not able to perform his job. (R. 313.) Plaintiff testified that he had pain "pretty much all over [his] back and [in] most of [his] joints," but primarily the pain was in his back and knees. (R. 315.) He stated that the pain in his back was "[p]retty much 24 hours a day" ranging in severity from level four to level ten on a ten point ascending scale, with zero being no pain at all. (R. 316-17.) Plaintiff indicated that he had pain at level ten "frequently." (R. 316.) He testified that he never really knows when he will be afflicted with level ten pain, but that some days he will wake up and "basically [be] unable to move." (R. 316.) When Plaintiff experiences level ten pain, he takes Lodine (nonsteroidal anti-inflammatory) along with aspirin or Advil, has hot baths, and uses various sports cremes, but none of these medications or treatments help that much. (R. 315, 317.) He testified that normally the pain is around a level seven and on a day where the pain is only at a level four or five, he would consider himself "very lucky." (R. 317.)

Plaintiff testified that he could walk three or four blocks before he has to stop due to knee pain, and cramps and muscle spasms in his back. (R. 318.) He stated that standing is difficult. (R. 318.) Plaintiff testified that he could sit for thirty to forty-five minutes, but after that his lower back would begin to hurt so he would have to lie down for a while and stretch his muscles to ease the pain. (R. 319.) He indicated that bending over is "pretty painful" and that he "can't bend anywhere close to the way [he] could even a year ago." (R. 319.) Plaintiff testified that his back pain has been consistent, but that it "didn't come as often a year or two years ago" and "it just seems to get worse and worse." (R. 319-20.) He stated that going up and down stairs also causes him pain and fatigue.

---

[3](...continued)

Plaintiff's "frequent absences and special conditions," the reviewer noted that he could be given an unsuccessful work attempt beginning on May 16, 1999. (R. 92.)

(R. 320.) Plaintiff testified that he could lift a gallon of milk, but he generally buys milk in smaller quantities because "[i]t's easier [for him] to manage." (R. 320-21.)

Plaintiff stated that he does household chores such as cleaning, cooking, laundry and dishes, but a friend sometimes helps him. (R. 323.) He indicated that he does not do a lot of cooking; rather, he purchases food that can be prepared in a microwave. (R. 323-24.) Plaintiff testified that he will sit outside sometimes, listen to the radio and watch television, but he rarely visits with friends except when he needs to be taken somewhere. (R. 322-23.) He stated that he can read, but his eyesight is not good enough to read for prolonged periods of time. (R. 323.) Plaintiff testified that all of the outside yard work around his home is done by the housing authority. (R. 321.) He also stated that he does not have a driver's license and he cannot drive "because of the medications that [he's] on." (R. 321.)

Plaintiff testified that, starting in May of 2000, he began seeing a counselor for depression. (R. 314-15.) He further stated that he took medication for his depression. (R. 315.)

Plaintiff stated that recently he had been diagnosed with diabetes, but that the full extent of his disease had not been determined. (R. 325.) Plaintiff also indicated that one of his physician's expressed his concern that Plaintiff's failing eyesight might be due to diabetes and that this physician was going to schedule an appointment for him with an ophthalmologist who would make that determination in the near future. (R. 325.)

## II.     MEDICAL EVIDENCE

### A.     Plaintiff's Physical Condition

On May 17, 1999, Plaintiff sought emergency room treatment complaining of abdominal and lower back pain, and was subsequently hospitalized for several days due to these conditions. (R. 117-

26.) Dr. Sadan K. Patel, M.D. (internist) examined Plaintiff and assessed him as having *inter alia* severe abdominal and lower back pain, a history of kidney stones, and tobaccoism. (R. 120.) Dr. Patel ordered an ultrasound and computed tomography ("CT") imagining scan of Plaintiff's abdomen, determined that a surgical consultation was needed, and indicated that pain medication should be given after a diagnosis was made. (R. 120.) Furthermore, Dr. Patel ordered a magnetic resonance imaging ("MRI") scan of Plaintiff's spine that would be performed after his discharge from the hospital. (R. 124, 126.)

During his hospitalization, Dr. Don E. Morehead, M.D. (surgeon) also examined Plaintiff and determined that his condition was a "musculoskeletal type of pain in the left flank [area] over the left kidney." (R. 122.) Dr. Morehead noted that Plaintiff's severe pain "had been present for approximately 30 hours [before] he was admitted" and he "ha[d] had a previous renal calculus which caused similar pain some years ago." (R. 122.)

Plaintiff was subsequently discharged from the hospital on May 21, 1999. Hospital progress notes at that time indicated that Plaintiff still had sharp, severe pain in the right side of his lower back. (R. 126.)

On June 1, 1999, Plaintiff underwent MRIs of his lumbar and thoracic spines. (R. 141.) The MRI of Plaintiff's lumbar spine *inter alia* showed "a very small posterior central herniation of the intervertebral disc (at L5-L6) with very minimal impingement on the caudal neural elements at this level" and "degenerative osteoarthritic changes in the posterior facet joints of L5-L6 and L6-S1 posterior facet joints." (R. 141-42.) The MRI also indicated that Plaintiff had "six lumbar vertebral segments." (R. 142.)

On June 8, 1999, Plaintiff underwent an X-ray examination of his lumbar and thoracic spines.

(R. 138-39.) The X-rays showed *inter alia* an "[i]ncidental marginal osteophyte at dorsal tenth level with minimal arthritic changes at the dorsal tenth-eleventh, eleventh and twelfth interspaces." (R. 139.) The X-rays also revealed that Plaintiff has a "transitional sixth lumbar vertebral segment" and "minimal degenerative osteoarthritic changes at the posterior facet joints at L5-6 and L6-S1 levels." (R. 139.)

On June 22, 1999, Plaintiff underwent a laparoscopic cholecystectomy (removal of gallbladder) with Dr. Joseph Kokoszka, M.D. (surgeon). (R. 147-48.) At that time, Plaintiff reported to Dr. Kokoszka that he had pain in his back that was predominantly on the left side and had sharp shooting pain from his lower back down into his leg. (R. 145.) Plaintiff also complained of nausea. (R. 145.) Dr. Kokoszka noted that Plaintiff's CT scan was significant for cholelithiasis (presence of gallstones). (R. 145.) In addition, Dr. Kokoszka told Plaintiff that the gallbladder surgery "may bring about symptomatic relief of his right upper quadrant pain, however, there [was] a possibility that he may have persistent pain after the surgery." (R. 146.)

After Plaintiff's surgery, he continued to complain of back and abdominal pain. (R. 195.) On June 29, 1999, Dr. Patel assessed Plaintiff's pain and found that the pain remained "persistent, severe, increased with movement . . . [and] sometimes [was] so severe that even Lortab (narcotic analgesic) does not help." (R. 195.) Dr. Patel noted Plaintiff was in "acute distress from . . . pain" and there was "severe tenderness in [Plaintiff's] mid thoraces just below the left scapula with stiffness present." (R. 195.) Dr. Patel further noted that Plaintiff had severe mid-back pain with muscle spasms in his back that have not improved over the last month and a half. (R. 195.) Dr. Patel's notes also indicated that Plaintiff has a "marginal osteophyte at T10," "[m]ild arthritis at T10-T11 and T11-12," and "mild degenerative joint disease [at] L5-L6 and L6-S1." (R. 195.)

Furthermore, as of that date, Plaintiff had limited bending (i.e., 45 degrees) and difficulty with straight leg raising (i.e., 30 degrees). (R. 195.) Dr. Patel continued Plaintiff's pain medication and referred him to a back specialist. (R. 195.)

Plaintiff reported severe lower back pain with associated muscle spasms to Dr. Patel in October of 1999. (R. 192.) For example, on October 1, 1999, Dr. Patel noted that Plaintiff had severe lower back pain, severe muscle spasms, severe abdominal pain on his right side, severe gastroesophageal reflux disease and degenerative joint disease of the lumbar and thoracic spines. (R. 192.) Moreover, on October 6, 1999, Dr. Patel noted that Plaintiff had "very severe pain in [his] back" with extremely severe "mid and lower back pain . . . even than [what] was seen on 10/1/99" with pain increasing "even with little movements." (R. 192.) Dr. Patel further noted that Plaintiff was "extremely severely distressed because of [his] severe pain" and considered Plaintiff to be "functionally disabled" as a result. (R. 191.) Dr. Patel referred Plaintiff to an orthopedic surgeon and prescribed additional medications. (R. 191.)

On November 4, 1999, Dr. Eric Ortinau, M.D. (orthopedic surgeon) examined Plaintiff and completed an SSA disability determination services form. (R. 155-56.) Dr. Ortinau diagnosed Plaintiff as having lower back strain. (R. 155.) He reported *inter alia* that Plaintiff had pain in his lower back, normal reflexes, six lumbar vertebrae (which is a normal variant), a normal range of motion in his lumbosacral spine, no evidence of nerve root compression, and was able to ambulate without assistance. (R. 155-56.) Dr. Ortinau noted that Plaintiff could perform all of his job-related duties and, therefore, he could return to work. (R. 156.) In completing the SSA form, however, Dr. Ortinau failed to note that Plaintiff had undergone surgery. (R. 156.)

On January 29, 2000, Plaintiff was once again admitted to the hospital. (R. 158.) Dr. Patel

diagnosed Plaintiff with severe chest wall pain (musculoskeletal in nature), severe depression, gastroesophageal reflex disease, severe anxiety, tobaccoism, and chronic lower back pain. (R. 158.) Dr. David Manigold, M.D. (internist) also treated Plaintiff during his hospitalization and noted that Plaintiff had not been working due to back pain, had been diagnosed with a herniated disc, had undergone a cholecystectomy, was taking Lorcet (narcotic analgesic), and suffered from erratic sleep, low moods, and crying spells. (R. 161-63.)

Plaintiff was discharged from the hospital on February 1, 2000, at which time Dr. Patel prescribed various medications which included Paxil (antidepressant), Serzone (antidepressant), Ibuprofen (nonsteroidal anti-inflammatory), Vicodin (narcotic analgesic) and Prilosec (stomach acid reducer). (R. 159-60.) Dr. Patel also recommended that Plaintiff seek a psychiatric consultation, but he refused to do so. (R. 160.) Furthermore, Dr. Patel instructed Plaintiff not to lift anything and would not release him to return to work. (R. 169.)

On March 31, 2000, Plaintiff saw Dr. Patel and reported that he continued to have severe lower back pain which was progressively getting worse, had difficulty sleeping at night, and was depressed. (R. 187.) Dr. Patel noted that Plaintiff was in acute distress, depressed and anxious. (R. 186.) He further noted that *inter alia* Plaintiff had severe tenderness in his lumbar spine, lower back pain, degenerative joint disease with osteophytes in his thoracolumbar spine, insomnia and gastroesophageal flux disease. (R. 186.) In his office notes, Dr. Patel indicated that an MRI of Plaintiff's thoracolumbar spine showed "marginal osteophyte at the T10 level, arthritis [at] T10-T11, T11-T12, and moderate degenerative joint disease at L5-L6, L6-S1." (R. 187.) Dr. Patel recommended that Plaintiff see a neurosurgeon for his chronic back pain, but he refused to do so. (R. 186.) He also indicated that Plaintiff should consult a psychiatrist if his anxiety and depression

8

got worse. (R. 186.) Dr. Patel continued Plaintiff's medications for his back pain, depression and gastroesophageal flux disease, and also prescribed Elavil (antidepressant). (R. 186.)

On April 17, 2000, Dr. Patel recommended that Plaintiff undergo a gastrointestinal endoscopy. (R. 186.)

On May 2, 2000, Dr. Patel noted that Plaintiff had severe neck pain that radiated up the back of his head and down into his upper back. (R. 182.) Dr. Patel assessed Plaintiff as he had on prior examinations; namely, that Plaintiff suffered from chronic lower back pain, degenerative joint disease, depression, anxiety, severe insomnia, osteophytes in the thoracolumbar spine, tobaccoism, and gastroesophageal flux disease. (R. 182-83.) He further indicated, on that date, that Plaintiff had acute cervical strain and high blood pressure. (R. 183.) Dr. Patel recommended Plaintiff have an X-ray examination of his cervical spine, quit smoking, and see a physician for an upper gastrointestinal endoscopy. (R. 183.) He continued Plaintiff's medications and also prescribed Soma (muscle relaxant), Medrol Dose Pack (corticosteroid anti-inflammatory), and Sonata (sleep aid). (R. 183.)

On June 1, 2000, Dr. Patel assessed Plaintiff as having severe cervical strain, mid and lower back pain, degenerative joint disease, osteophytes in the thoracic spine, hypertension as well as severe depression, anxiety and insomnia. (R. 279.) Dr. Patel reported that Plaintiff was not taking his prescribed medications because he could not afford them and, moreover, Plaintiff refused to go to physical therapy. (R. 279.) Furthermore, Plaintiff had not seen either a neurosurgeon or an orthopaedic surgeon as Dr. Patel had recommended because he could not afford to do so. (R. 278.)

In August of 2000, Plaintiff underwent an MRI of his cervical spine which showed a herniated disc at C6-C7 with compression of the C7 nerve root. (R. 271.) Plaintiff saw a neurosurgeon; however, surgery was not recommended. (R. 271.)

9

In October of 2000, Dr. Patel examined Plaintiff and noted that he was in acute distress and had severe tenderness in his lumbar spine with severe muscle stiffness. (R. 277.) At that time, Plaintiff's range of motion was severely restricted and his straight leg raising test was severely limited (at zero degrees). (R. 277.) Dr. Patel noted that Plaintiff "had a hard time even lying on [a] bed." (R. 277.) Dr. Patel's office notes further indicated that Plaintiff recently had an episode of severe lower back pain that required emergency care. (R. 277.)

In February of 2001, Dr. Patel noted essentially the same clinical findings as he had since he began treating Plaintiff. (R. 270.) Plaintiff, however, also reported severe left-sided elbow pain which was not associated with any type of injury. (R. 269.)

In March of 2001, Plaintiff began treatment with Dr. James Pelton, M.D. (R. 257-65.) Plaintiff told Dr. Pelton that he suffered from chronic lower back pain and depression. (R. 264.) Upon examining Plaintiff, Dr. Pelton noted that Plaintiff was not in acute distress, he had no muscle spasms or radicular pain, and he had normal spinal curves (except for flattening of the lumbar area). (R. 264.) Moreover, Dr. Pelton found that Plaintiff's muscle strength was good, he had good heel toe strength, and his patellar and Achilles tendon reflexes were intact. (R. 264.) In addition, Dr. Pelton's April 2001 progress notes indicated that Plaintiff has chronic lower back pain, degenerative changes of the lumbar spine, and a "very small central disc herniation of [the] L5-L6 disc." (R. 260.)

## B.    Plaintiff's Mental Condition

On May 2, 2000, Plaintiff saw Elizabeth Roberts, a licensed clinical social worker, who completed a psychiatric report for the SSA. (R. 208-10.) Ms. Roberts reported that Plaintiff had a depressed anxious mood. (R. 209.) She diagnosed him with an adjustment disorder with mixed anxiety and depressed mood as well as a personality disorder not otherwise specified (with passive

traits). (R. 210.) Ms. Roberts determined that Plaintiff was able to complete tasks and understand directions. (R. 210.) She also noted that Plaintiff lacked the funds to pay for medications and recommended that he attend individual therapy sessions. (R. 210.) Ms. Roberts further reported that Plaintiff stated that he was able to perform light housekeeping duties, walked one to two miles, read at the library and spent time with his grandson. (R. 208.)

On June 20, 2000, Dr. Carl Hermsmeyer, Ph.D., a state agency psychologist, signed and dated a Psychiatric Review Technique Form (but did not complete the form). (R. 215-23.) The record, however, also contains another form entitled Residual Functional Capacity Assessment (for mental impairments) which is undated and unsigned. (R. 224-27.)

On June 30, 2000, Plaintiff underwent a consultative psychological evaluation with Dr. Mark B. Langgut, Ph.D. (R. 211-14.) Dr. Langgut reported that Plaintiff appeared depressed because he had "slowed, measured speech, a constricted emotional range, and a hapless presentation." (R. 211.) Dr. Langgut noted that Plaintiff had "suffered from clinical depression for the past year" and there was evidence of his depression since 1997. (R. 211.) At the time of the examination, Dr. Langgut reported that Plaintiff "experiences depressive symptoms including hopelessness, lethargy, sleep problems, anhedonia, decreased concentration, and impaired decision making, as well as daily mood disturbance, psychomotor retardation, and marked interference in social functioning." (R. 213.) He also noted that Plaintiff admitted to suicidal ideation and thinks about self-harm on a daily basis. (R. 213.) Upon mental status examination, Dr. Langgut found that Plaintiff's memory and judgment skills were intact and that he possessed an adequate degree of abstract reasoning skills. (R. 213-14.) He also determined, however, that Plaintiff's speed of thinking was slowed and he had mildly obsessive ideas. (R. 214.) Dr. Langgut diagnosed Plaintiff with major depressive disorder (moderate

11

to severe), an anxiety disorder with panic features, and a history of alcohol abuse. (R. 214.)

On July 19, 2000, Dr. Hermsmeyer completed a Psychiatric Review Technique Form. (R. 228-36.) At that time, Dr. Hermsmeyer reported that Plaintiff did not meet the criteria for the affective disorders listing (i.e. Listing 12.04). (R. 231.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Dr. Hermsmeyer noted that because Plaintiff's severe impairment(s) did not meet or equal a listed impairment, a residual functional capacity ("RFC") assessment was necessary. (R. 228.) He further indicated that Plaintiff had a "slight" functional limitation with respect to his daily activities and social functioning, "seldom" experienced deficiencies of concentration, persistence or pace, and there was "insufficient evidence" to determined if Plaintiff had episodes of deterioration or decompensation in work or work-like settings. (R. 235.)

On October 15, 2001, Mr. Daniel Veronda (mental health therapist) informed an SSA representative by letter that Plaintiff had been diagnosed with a major depressive disorder. (R. 294.) Moreover, Mr. Veronda indicated in the letter that Plaintiff saw a psychiatrist, took medication, attended group therapy, had a Global Assessment of Functioning ("GAF")[4] score of 50 and was currently unemployable. (R. 294.)

## III.   VOCATIONAL EXPERT'S TESTIMONY

Ms. Jennie Chin ("Chin"), a VE, testified at the administrative hearing. (R. 326-30.) The ALJ posed the following hypothetical question to Ms. Chin:

---

[4]GAF measures an individual's overall level of psychological, social, and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 32 (rev. 4th ed. 2000). A GAF score of 41-50 is intended to identify an individual with "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

Assume a 48-year old individual with eight years of formal education, past relevant work the same as the claimant's. Let's assume this individual is capable of performing light work, except that there should be – it should be limited to simple repetitive tasks and there should be reduced interaction with others. By that I mean that something on the order of a deli counter worker would not work. That person is dealing with not only customers, but with kitchen staff. By the same token, some [thing] on the order of a parking lot attendant would work. That individual may see hundreds of people every day, but all he is doing [is] taking their tickets and making change. With those limitations, would there be jobs that the individual could perform? (R. 327-28.)

Based on this hypothetical question, Ms. Chin testified that Plaintiff could not perform any of his past relevant work. (R. 328.) Ms. Chin concluded, however, that Plaintiff could perform work in other occupational areas; including, work as a cleaner (8,751 jobs), assembler (25,926 jobs), and hand packager (13,707 jobs). (R. 328.)

Ms. Chin further testified that if the hypothetical person posed in the ALJ's question was restricted to limited extensive walking, the number of cleaner jobs would be reduced by fifty percent. (R. 328-29.) Moreover, if the hypothetical person were additionally restricted to a ten pound lifting restriction, the number of assembler and hand packager jobs would be reduced by fifty percent. (R. 329.) Ms. Chin also stated that the amount of absenteeism permitted for these types of jobs is "usually . . .10 to 12 days a year," which "averages out to like once a month." (R. 329.)

## IV.    THE ALJ'S FINDINGS AND DECISION HEREIN

The ALJ determined that Plaintiff has not engaged in any substantial gainful activity since the alleged onset date of his disabling condition. (R. 21.) The medical evidence establishes that Plaintiff suffers from severe back pain and depression which significantly limits his ability to perform basic work activities; consequently, his impairments are severe. (R. 13, 15, 21.)

The ALJ found that Plaintiff did not have an impairment or combination of impairments

13

listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulation No. 4. (R. 21.) Because the ALJ determined that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ assessed Plaintiff's RFC to determine what he could do despite his limitations. (R. 22.)

The ALJ concluded that Plaintiff has the RFC to perform a significant range of light work because he could lift and carry objects weighing up to twenty pounds occasionally and ten pounds frequently. (R. 22.) However, the ALJ found that Plaintiff was unable to perform any of his past relevant work and had no transferable skills from any past relevant work. (R. 22.)

The ALJ determined that Plaintiff could perform simple, repetitive tasks that require only reduced interaction with others and could work at jobs that do not require extensive walking. (R. 22.) Ultimately, the ALJ found, using the Medical-Vocational Guidelines, Rule 202.21, as a framework, which was supplemented by the VE's testimony, that Plaintiff could perform a significant number of jobs in the national economy; including work as a cleaner, assembler and hand packager. (R. 22.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

The ALJ further found that Plaintiff's allegations regarding his limitations were not fully credible. (R. 21.)

Accordingly, the ALJ determined that Plaintiff was not disabled under the terms of the Act. (R. 22.)

## LEGAL STANDARDS

### I.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are

supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d

842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence,

or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390.

Conclusions of law, however, are not entitled to deference. Thus, if the Commissioner commits an

error of law, reversal is required without regard to the volume of evidence in support of the factual

findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## II.  STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, SSI and DIB claimants must be "disabled" as defined by the

Act. *See* 42 U.S.C. § 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th

Cir. 1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than

12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10

F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe

impairment that renders him unable to do his previous work or any other substantial gainful activity

that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a

claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first

considers whether the claimant is presently employed or "engaged in substantial gainful activity."

20 C.F.R. § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if

he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's RFC and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant -- in light of his age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision finding that he is not disabled.

Upon review of the record, the Court finds that an outright reversal is not warranted. Separately, as it relates to remand, Plaintiff alleges that: (1) the ALJ erred in finding that Plaintiff has the RFC to perform light work, and (2) the ALJ erred in his credibility finding of Plaintiff.

16

## I. THE ALJ'S FINDING THAT PLAINTIFF HAS THE RESIDUAL FUNCTIONAL CAPACITY TO PERFORM A SIGNIFICANT RANGE OF LIGHT WORK IS NOT SUPPORTED BY THE RECORD.

Upon review, the Court finds that the ALJ's determination that Plaintiff has the RFC to perform a significant range of light work is unsupported by the record. (R. 22.) Specifically, there exists no real basis in the 330 page record for the ALJ's determination that Plaintiff has the RFC "to lift and carry objects weighing up to 20 pounds occasionally and 10 pounds frequently." (R. 22.) *See* 20 C.F.R. § 404.1567(b); 416.967(b).[5] For instance, there are no clinical or laboratory findings or medical reports from Drs. Patel and Pelton, Plaintiff's treating physicians, or any state agency physicians, indicating that Plaintiff had the capacity to lift and carry objects weighing up to 20 pounds occasionally and 10 pounds frequently.[6] And nowhere in the record is there any physical residual functional capacity evaluation. The Court therefore notes that the record lacks any type of evaluation or assessment of Plaintiff's RFC indicating what physical limitations would apply to Plaintiff in a work environment. Thus, the Court can only speculate as to how the ALJ determined that Plaintiff is capable of lifting and carrying objects weighing up to 20 pounds occasionally and 10 pounds frequently. Accordingly, a remand for further proceedings as to this issue is warranted.

_____

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b); 416.967(b). Social Security Ruling 83-10 further provides that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday when frequent lifting or carrying is involved. *SSR* 83-10.

[6]The Court notes that the record contains a Residual Functional Capacity Assessment form (for mental impairments) which is undated and unsigned. (R. 224-27.)

## II. THE ALJ IMPERMISSIBLY IGNORED OR FAILED TO ADDRESS RELEVANT MEDICAL EVIDENCE IN DETERMINING THAT PLAINTIFF WAS CAPABLE OF PERFORMING A SIGNIFICANT RANGE OF LIGHT WORK.

Plaintiff avers that the ALJ arbitrarily "played doctor" in determining his RFC because the record does not support the ALJ's finding that he is capable of performing light work. (Pl.'s Mem. at 20-21.) For instance, Plaintiff points to the fact that Dr. Patel noted in a hospital discharge report, on February 1, 2000, that he should not lift anything and, at that time, he was not able to return to work. (*Id.* at 21; R. 169.) Moreover, shortly after Plaintiff's averred disability onset date (May 16, 1999), he was placed on light duty and eventually quit working (September 25, 1999) because his back pain was so severe that he could no longer perform his duties. (*Id.* at 21; R. 76, 92.) Moreover, Mr. Veronda (mental health therapist) reported, on October 15, 2001, that Plaintiff had a GAF score of 50 and indicated that he is "currently unemployable." (*Id.* at 20; R. 294.) Plaintiff further asserts that the ALJ should have specified the evidence in the record he relied on in making his RFC finding. (*Id.* at 21.)

Defendant, on the other hand, contends that the ALJ appropriately weighed the evidence and reasonably concluded that Plaintiff could perform a limited range of light work. (Def.'s Mem. at 9.) For example, Defendant argues that while Plaintiff contends that the ALJ "played doctor," the ALJ was required to resolve the evidentiary conflicts in the record including "the conflict between the relatively minimal clinical and diagnostic findings and Plaintiff's complaints of debilitating limitations." (*Id.* at 10.) Therefore, according to Defendant, the ALJ's conclusions were reasonable and within the ALJ's discretion as fact finder. (*Id.* 10-11.)

It is established in Social Security law that an ALJ may not play doctor and substitute his own opinion for that of a physician, or make judgments that are not substantiated by objective medical

evidence. *Rohan v. Chater,* 98 F.3d 966, 970-71 (7th Cir. 1996). In other words, ALJs must not

succumb to the temptation to play doctor and make their own independent medical findings. *Id.* See

also *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990), *cert. denied,* 502 U.S. 901, 112 S.Ct.

278, 116 L.Ed.2d 230; *Scivally v. Sullivan,* 966 F.2d 1070, 1076 (7th Cir. 1992). An ALJ will be

reversed in those cases where the ALJ impermissibly played doctor by failing to address relevant

evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir. 2001).

The Court finds that the evidentiary record reflects objective medical evidence that the ALJ

ignored or failed to address in making his RFC finding. For example, the medical evidence in the

case establishes *inter alia* that Plaintiff suffers from severe back pain, two herniated discs (one at

L5-L6 and the other at C6-C7), osteoarthritis, degenerative joint disease, osteophytes in the

thoracolumbar spine, nerve root compression, gastroesophageal reflux disease, and hypertension.[7]

(R. 139, 141-42, 183, 186, 187, 192, 195, 260, 270, 271, 279.) The ALJ, in his decision, however,

---

[7]The Court also notes that other evidence in the record establishes *inter alia* that Plaintiff
suffers from a major depressive disorder, an anxiety disorder, and a personality disorder. (R.
183, 186, 209, 210, 211, 213, 214, 226, 294.) The ALJ determined, however, that Plaintiff's
mental impairment(s) did not meet Listing 12.04 or Listing 12.06. *See* 20 C.F.R. Pt. 404, Subpt.
P, App. 1, §§ 12.04; 12.06. (R. 16-18.) While the ALJ determined that Plaintiff did meet the
criteria under subpart "A" for these listings, he found that Plaintiff did not meet the criteria under
subpart "B" and/or subpart "C." (R. 16-18.) Based on the record, however, Plaintiff may, in fact,
meet the criteria under subpart "B" for these listings. Specifically, under subpart "B", a claimant
must have a limitation in at least two of the following areas: "(1) marked restriction of activities
of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked
difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of
decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04;
12.06. As demonstrated by the record, Plaintiff has fairly restricted daily activities and limited
social interaction with others. (R. 18-19, 318, 322-23.) Dr. Langgut also noted that Plaintiff had
decreased concentration and a marked interference in social functioning. (R. 213.) Furthermore,
Dr. Hermsmeyer noted that there was insufficient evidence in the record to determine if Plaintiff
had episodes of deterioration or decompensation in work or work-like settings. (R. 235.)
Therefore, the Court concludes that the ALJ's analysis with respect to Plaintiff's mental
impairment(s) may not be fully developed in this area.

failed to address how these medical findings and assessments would affect Plaintiff's ability to perform light work. Rather, the ALJ mischaracterizes certain of the medical evidence and makes erroneous factual statements that are unsupported by the record (i.e., The ALJ states Dr. Delheimer recommended surgery; however, Dr. Delheimer did not recommend that Plaintiff have surgery after an MRI showed a herniated disc at C6-C7 and nerve root compression). (R. 14, 271.)

Accordingly, the Court finds that the ALJ erred by impermissibly playing doctor when he ignored and failed to address relevant medical evidence. *Dixon*, 270 F.3d at 1177. Of course, the ALJ need not discuss every piece of evidence (if he has considered the important evidence). However, in failing to address relevant evidence favorable to Plaintiff, herein, the ALJ appears to have implicitly relied on other evidence in the record which was unfavorable to Plaintiff. *See e.g., Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1983) (a court will remand a cause if the ALJ fails to give at least a minimal articulation of why the claimant's line of evidence was rejected). Thus, while the ALJ mentions or lists some of the medical evidence, he fails to articulate his basis for either crediting or rejecting specific diagnoses and assessments favorable to Plaintiff. *See e.g., Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)(an ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'")(citation omitted). In other words, the ALJ never attempts to actually explain (and medically explain where medical evidence was involved) why the evidence that is favorable to Plaintiff (e.g., diagnoses of severe back pain, two herniated discs, osteoarthritis, degenerative joint disease, osteophytes in the thoracolumbar spine, nerve root compression, gastroesophageal reflux disease, and hypertension) is overcome by evidence that is unfavorable. Moreover, even though an ALJ may reject a physician's opinion if it appears to be

based on a claimant's exaggerated subjective complaints, herein, the ALJ improperly either entirely ignored or (at a minimum) failed to address relevant evidence that potentially substantiated Plaintiff's claims. *See e.g., Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).

The Seventh Circuit's decision in *Golembiewski v. Barnhart,* 322 F.3d 912 (7th Cir. 2003) is squarely applicable on this issue. In that case, the court remanded the cause to the Commissioner for further proceedings, *inter alia,* because:

> [T]he ALJ ignored significant [medical] evidence supporting his claim. The ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), the ALJ may not ignore an entire line of evidence that is contrary to the ruling, *Zurawski,* 245 F.3d at 888. Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence. *Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir. 2000). A remand is required here because the ALJ improperly ignored . . . lines of evidence. 322 F.3d at 917.

*See also Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003)(case remand because *inter alia* the ALJ's opinion did not sufficiently discuss the conflicting evidence regarding the claimant's impairments and failed to mention the strongest piece of evidence supporting the claimant's claim for benefits). Therefore, a remand on this issue is warranted.

## III. THE ALJ'S HYPOTHETICAL QUESTION WAS NOT ADEQUATE.

Plaintiff avers that the ALJ's hypothetical question was inadequate because it was based on an erroneous RFC finding that he could perform light work and it also did not accurately reflect his pain and physical limitations. (Pl.'s Mem. at 22.) Therefore, according to Plaintiff, the ALJ erred in relying on the VE's testimony, based on this hypothetical, that there were a significant number of jobs in the national economy that Plaintiff was capable of performing. (*Id.*)

Defendant, on the other hand, asserts that the ALJ's hypothetical question adequately

reflected Plaintiff's pain and physical limitations. (Def.'s Mem. at 13-14.) Defendant contends that

Plaintiff's pain was necessarily incorporated in the ALJ's hypothetical question because it was based

on the ALJ's finding that Plaintiff could perform a significant range of light work and, moreover,

Plaintiff's "pain is the only element in the record that could support any [type of] limitation." (*Id.*)

At the administrative hearing, the ALJ propounded the following hypothetical question to

the VE, which, as stated, the VE responded affirmatively to:

> Assume a 48-year old individual with eight years of formal education, past relevant
> work the same as the claimant's. Let's assume this individual is capable of
> performing light work, except that there should be – it should be limited to simple
> repetitive tasks and there should be reduced interaction with others. By that I mean
> that something on the order of a deli counter worker would not work. That person is
> dealing with not only customers, but with kitchen staff. By the same token, some
> [thing] on the order of a parking lot attendant would work. That individual may see
> hundreds of people every day, but all he is doing [is] taking their tickets and making
> change. With those limitations, would there be jobs that the individual could
> perform? (R. 327-28.)

The Court has found herein that the ALJ's determination that the Plaintiff could perform light

work (as defined in the relevant law), was not supported by the record. (pp. 17-22, *supra*). Similarly,

the ALJ's hypothetical, whose underlying assumption is that Plaintiff can perform "light work" (and

also given (a) the context in which this assumption was made and (b) its corresponding specific

assumptions *inter alia* as to specific jobs Plaintiff can perform), was faulty and not supported by the

record.[8]

Accordingly, a remand for further proceedings, as a result of this issue, is warranted.

---

[8]Although the Court does not decide the pain and physical limitations issue(s) raised, the
following authorities can be noted upon remand: *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir.
2002)("Hypothetical questions posed to vocational experts ordinarily must include *all* limitations
supported by medical evidence in the record.")(citation omitted); *Kasarsky v. Barnhart*, 335 F.3d
359, 544 (7th Cir. 2003)(case remanded because the hypothetical question posed to the VE did
not adequately reflect the extent of claimant's mental limitations).

## IV. THE ALJ SHOULD HAVE OBTAINED TESTIMONY FROM A MEDICAL EXPERT(S).

The procedure for adjudicating a social security disability insurance benefits claim differs significantly from the adversarial model. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). The procedure requires the ALJ to summon a medical expert if there is not an adequate medical basis in the record for determining whether the claimant is disabled. *See id.* (stating that the procedure for adjudicating social security disability claims "requir[es] the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.") *See also* 20 C.F.R. § 404.1527(f)(2)(iii); 416.927(f)(2)(iii)(an administrative law judge may also ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairments.) In *Green,* "[t]he administrative law judge refused to believe [the plaintiff's] 'complaints of debilitating pain and limitations' because they were disproportionate to the objective medical findings in the record." *See id.* The ALJ, however, did not summon a medical expert. *See id.* Accordingly, the case was remanded by the Seventh Circuit to the Commissioner for further proceedings.

Herein, equivalently to *Green,* because the ALJ believed that Plaintiff's subjective complaints of severe pain and physical and mental limitations were not reasonably supported by the medical evidence, he should be required to summon a medical expert or experts to provide an informed basis for determining whether Plaintiff was disabled. Therefore, because the ALJ lacked an informed basis necessary to make his decision and ultimately, played doctor by making an independent medical judgment, a remand is warranted. *See e.g., Blakes v. Barnhart,* 331 F.3d 565, 570 (7th Cir. 2003)("[T]he ALJ should have summoned an expert to provide an informed basis for

determining whether [the claimant] was disabled.") Accordingly, on remand, the ALJ is instructed to obtain testimony from a Medical Expert(s).

## CONCLUSION[9]

In view of the foregoing, the Court grants Plaintiff's Motion for Summary Judgment insofar as it requests a remand and denies Defendant's Motion for Summary Judgment. Accordingly, the cause is remanded, pursuant to sentence four of 42 U.S.C. § 405, to the Commissioner for further proceedings consistent with this opinion.

ENTER:

*IAN H. LEVIN*
**IAN H. LEVIN**
**U.S. Magistrate Judge**

**Dated: September 25, 2003**

---

[9]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.